IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 21-4255

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

JAVAID PERWAIZ,

*Appellant*.

_____

Appeal from the United States District Court
for the Eastern District of Virginia
at Norfolk
*The Honorable Rebecca Beach Smith, Senior District Judge*

_____

CORRECTED BRIEF OF THE UNITED STATES

_____

Jessica D. Aber
United States Attorney

Joseph Attias
Assistant United States Attorney

E. Rebecca Gantt
Elizabeth M. Yusi
Assistant United States Attorneys
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
(757) 441-6331

*Attorneys for the United States of America*

## Table of Contents

**Page**

Table of Authorities ................................................................ iv

Introduction ...........................................................................1

Issues Presented ....................................................................2

Statement of the Case............................................................2

    A.   Perwaiz's Medical Background .............................................2

    B.   Perwaiz's Scheme to Defraud ...............................................5

        1.   Falsification of Estimated Delivery Dates .......................6

        2.   Medically Unnecessary Surgeries Based on Falsified Symptoms........................................................................8

        3.   Falsified In-Office Diagnostic Procedures (Hysteroscopies and Colposcopies)..........................................................12

        4.   Falsified Sterilization Consent Forms...........................14

    C.   The Superseding Indictment, Trial, and Sentencing ...........15

        1.   Evidence of Maryview Suspension and Felony Tax Convictions.................................................................16

        2.   The Trial, Voluminous Evidence, and Verdict .............17

        3.   Sentencing ...................................................................20

Summary of Argument...........................................................20

Argument...............................................................................22

i

I.   There was no abuse of discretion in admitting certain evidence of
     Perwaiz's suspension of hospital privileges and tax convictions.................22

     A.   The district court did not abuse its discretion in admitting
          evidence of Perwaiz's suspension of hospital privileges, Exhibit
          150, under either Rule 404(b) or Rule 403. .........................................22

          1.   Rule 404(b) presented no bar to the admission of Exhibit
               150..............................................................................................23

          a.   Rule 404(b) is inapplicable because Exhibit 150 was intrinsic
               to Counts 58 and 59. ....................................................................24

          b.   Even if extrinsic evidence, Exhibit 150 satisfies Rule 404(b).......29

          i.   Exhibit 150 was relevant................................................................29

          ii.  Exhibit 150 was necessary. ...........................................................33

          iii. Exhibit 150 was reliable.................................................................34

          2.   The district court did not abuse its discretion under Rule 403
               in admitting Exhibit 150. ..............................................................36

     B.   The district court did not abuse its discretion under Rule 403 in
          admitting Exhibit 152A.....................................................................40

     C.   Any error in admitting Exhibits 150 or 152A was harmless. ............44

II.  There was no plain error in allowing the testimony of six patients not
     listed in specific counts...................................................................50

     A.   There is no plain error under this Court's precedent. .........................51

          1.   The testimony of the six patients was intrinsic evidence of
               the charged scheme to defraud, proof of a necessary element
               of the health care fraud counts......................................................51

2.   Even if the testimony was not intrinsic evidence, Perwaiz cannot show any Rule 404(b) violation. ........................................53

3.   Perwaiz cannot show any error that was plain. ...........................54

B.   Perwaiz's substantial rights were not impacted in light of the overwhelming evidence ........................................................................57

III.   Perwaiz has not shown any ineffective assistance of counsel at sentencing that is clear in the record and satisfies *Cronic*. ...........................59

Conclusion ........................................................................................................66

Statement Regarding Oral Argument ....................................................................67

Certificate of Compliance ........................................................................................68

Certificate of Service ................................................................................................69

# Table of Authorities

**Page**

## Cases

*Bell v. Cone*, 535 U.S. 685 (2002) ...........................................................60

*Darden v. Wainwright*, 477 U.S. 168 (1986)...........................................64

*Fink v. Lockhart*, 823 F.2d 204 (8th Cir. 1987)......................................63

*James v. Harrison*, 389 F.3d 450 (4th Cir. 2004)....................................60

*Massaro v. United States*, 538 U.S. 500 (2003) ......................................59

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004).......................56

*Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339 (4th Cir. 2014) ...........41

*Moss v. Hofbauer*, 286 F.3d 851 (6th Cir. 2002).....................................63

*Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021).......................................56

*Siverson v. O'Leary*, 764 F.2d 1208 (7th Cir. 1985) ...............................63

*Strickland v. Washington*, 466 U.S. 668 (1984) .................. 59, 62, 64, 65

*United States v. Aramony*, 88 F.3d 1369 (4th Cir. 1996) ........................34

*United States v. Bailey*, 990 F.2d 119 (4th Cir. 1993)............................35

*United States v. Bajoghli*, 785 F.3d 957 (4th Cir. 2015) ............... passim

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) ................... 26, 28

*United States v. Billingsley*, 192 F. App'x 201 (4th Cir. 2006).............45

*United States v. Blake*, 571 F.3d 331 (4th Cir. 2009)..............................42

*United States v. Brizuela*, 962 F.3d 784 (4th Cir. 2020) ..................... 26, 54, 55, 56

*United States v. Bush*, 944 F.3d 189 (4th Cir. 2019).............................23

*United States v. Carthorne*, 726 F.3d 503 (4th Cir. 2013) ......................51

*United States v. Carthorne*, 878 F.3d 458 (4th Cir. 2017) ......................56

*United States v. Chin*, 83 F.3d 83 (4th Cir. 1996) ..................................23

*United States v. Ebert*, 61 F.4th 394 (4th Cir. 2023) ........................ 24, 30

*United States v. Faulls*, 821 F.3d 502 (4th Cir. 2016)....................... 39, 43

*United States v. Flores-Granados*, 783 F.3d 487 (4th Cir. 2015)...........24

*United States v. Ford*, 784 F.3d 1386 (11th Cir. 2015) ...........................56

*United States v. Freeman*, 24 F.4th 320 (4th Cir. 2022) ...........................66

*United States v. Gaudin*, 515 U.S. 506 (1995) ....................................27

*United States v. Gooding*, 594 F. App'x 123 (4th Cir. 2014)..................63

*United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998).....................37

*United States v. Heater*, 63 F.3d 311 (4th Cir. 1995)...........................22

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010)........................44

*United States v. Keita*, 742 F.3d 184 (4th Cir. 2014) ...........................51

*United States v. Legins*, 34 F.4th 304 (4th Cir. 2022) ...........................57

*United States v. Lentz,* 524 F.3d 501 (4th Cir. 2008) ...........................36

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010)....................... 27, 34

*United States v. Locke*, 643 F.3d 235 (7th Cir. 2011) ...........................57

*United States v. Logan*, 593 F. App'x 179 (4th Cir. 2014).....................28

*United States v. Mandello*, 426 F.2d 1021 (4th Cir. 1970).....................59

*United States v. Marshall*, 872 F.3d 213 (4th Cir. 2017) .......................23

*United States v. Maxwell,* 285 F.3d 336 (4th Cir. 2002) ........................54

*United States v. McLaurin*, 764 F.3d 372, (4th Cir. 2014) ........................ 30, 33, 54

*United States v. Miller*, 61 F.4th 426 (4th Cir. 2023)...................... 36, 37

*United States v. Pless*, 79 F.3d 1217 (D.C. Cir. 1996) ..........................57

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997)...................... 22, 31, 33, 54

*United States v. Ragin*, 820 F.3d 609 (4th Cir. 2016) ...........................60

*United States v. Rawle*, 845 F.2d 1244 (4th Cir. 1988) .........................22

*United States v. Sanchez*, 790 F.2d 245 (2nd Cir. 1986).......................63

*United States v. Siegel*, 536 F.3d 306 (4th Cir. 2008) ..........................29

*United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008) ........................40

*United States v. Van Metre*, 150 F.3d 339 (4th Cir. 1998).....................29

*United States v. Weaver,* 282 F.3d 302 (4th Cir. 2002)..........................36

*Valentino v. Clarke*, 972 F.3d 560 (4th Cir. 2020)...............................63

*Warner v. Ford*, 752 F.2d 622 (11th Cir. 1985) ..................................63

*Yarborough v. Gentry*, 540 U.S. 1 (2003) .......................................... 65, 66

**Statutes**

18 U.S.C. § 1028A .........................................................................15

18 U.S.C. § 1035 .............................................................. 15, 25, 27

18 U.S.C. § 1347 ............................................................................15

18 U.S.C. § 3553 ............................................... 65, 66, 68, 69

21 U.S.C. § 841 ............................................................................57

28 U.S.C. § 2255 ...........................................................................63

**Rules**

Federal Rule of Appellate Procedure 28 ......................................24

Federal Rule of Criminal Procedure 52 .......................................22

Federal Rule of Evidence 403 .......................................... passim

Federal Rule of Evidence 404(a) ..................................... 16, 43

Federal Rule of Evidence 404(b) ...................................... passim

Federal Rule of Evidence 609 .......................................................16

## Introduction

Defendant Javaid Perwaiz used his trusted position as an obstetrician/ gynecologist (OB/GYN) and his aptitude for manipulation and deceit to convince his patients to undergo unnecessary invasive surgeries, deliver their children prematurely for his own convenience, and go through hurried sterilizations. Then, to ensure he would receive payment for those procedures from health insurance companies, Perwaiz falsified required paperwork by fabricating due dates for pregnant patients, inventing symptoms patients did not actually have to justify surgeries, fabricating results from diagnostic procedures, backdating sterilization consent forms, and making false disclosures about his criminal history and hospital privileges.

After a four-and-a-half week trial at which the government presented testimony from 55 witness and over 500 exhibits, a jury found Perwaiz guilty of 52 counts of health care fraud and false statements. On appeal, Perwaiz claims evidentiary error regarding two exhibits and testimony of six patient-witnesses. As to the exhibits, Perwaiz cannot show any abuse of discretion because both were directly relevant, unique, and intrinsic to two false statement counts charging Perwaiz with lying about his background to health insurance companies. And there was also no plain error in allowing the testimony of the patient-witnesses; as intrinsic evidence of the scheme to defraud, it was clearly permitted under this

1

Court's precedent. Even if Perwaiz could show error, it would be harmless considering the voluminous and overlapping evidence supporting guilt.

Because Perwaiz's claims lack merit, the Court should affirm the convictions and sentence.

## Issues Presented

1.      Did the district court abuse its discretion under 1) Rules 404(b) and 403 in admitting an exhibit demonstrating Perwaiz's suspension of hospital privileges, or 2) under Rule 403 in admitting an exhibit demonstrating Perwaiz's felony tax convictions?

2.      Did the district court plainly err in permitting the unobjected-to testimony of six patients, which was intrinsic evidence of Perwaiz's scheme to defraud?

3.      Did Perwaiz receive ineffective assistance of counsel at sentencing that is conclusively apparent on the record, specifically a complete denial of counsel such that prejudice can be presumed?

## Statement of the Case

### A.      Perwaiz's Medical Background

After completing his OB/GYN residency, Perwaiz was licensed in Virginia and worked for a short time in a small practice in Portsmouth. JA2193, JA2629–2630. In 1980, Perwaiz applied for and received temporary privileges to practice

2

at Maryview Hospital ("Maryview") in Norfolk.  JA2632.  In August 1982,

Perwaiz opened his own solo OB/GYN practice in Chesapeake, Virginia.  JA2633,

JA2852.

In 1983, Maryview suspended Perwaiz's temporary privileges "due to poor

clinical judgment, unnecessary surgery, lack of documentation, and discrepancies

in recordkeeping."  JA2496–2501, JA2637–2640, JA3065–3066, JA7483–7487.

Among other procedures, Maryview specified Perwaiz performed hysterectomies

on eleven patients "contrary to sound medical judgment."  JA7484–7486.

Maryview's termination triggered a separate proceeding before Virginia's medical

licensing authority ("Virginia Board of Medicine"), which censured Perwaiz for

"lack of documentation" and a sexual relationship with a patient.  JA3068, JA7488.

Maryview conditionally reinstated Perwaiz's hospital privileges in 1985.  JA2503.

Perwaiz continued to maintain his practice in Chesapeake, and practiced at

several area hospitals.  JA2536, JA2637–2638.  In 1995, he was charged with six

federal felony counts of signing and filing false tax returns.  JA2506, SA45–55.

He pleaded guilty to two counts and admitted to falsely claiming personal expenses

as business expenses for his medical practice on his medical practice's federal tax

returns.  JA2506–2515, SA45–55.  For example, Perwaiz claimed a Ferrari as

purchases of ultrasound, hysteroscope, and colposcope machines for his practice.

SA46–47.  On April 10, 1996, the district court sentenced him to 5 years'

3

probation.  JA7524.  The Virginia Board of Medicine revoked Perwaiz's license to practice medicine based on the felony convictions and reinstated his license approximately three-and-a-half months later.  JA2514–2515, JA7528–7539.

As with all doctors, Perwaiz had to apply and periodically reapply to various health care insurance companies in order to be registered as a provider.  JA625–626, JA1371–1372, JA1567.  These applications and updates require the applicant to provide information about criminal, licensure, and hospital privilege history.  JA370–371, JA626–627, JA1833–1834.  Over the years, Perwaiz routinely lied on these applications about his disciplinary and criminal history.[1]  JA429–432, JA626–627, JA629–630, JA1372–1373, JA1569–1573, JA1834–1842, JA2492–2505, SA7–8, SA35–36, SA40–41, JA7443–7449, JA8055, JA8107.

For example, in July 2017, Perwaiz filed an application to be a provider for Anthem.  JA1834–1842, JA2492–2496, SA1–19.  The Anthem application asked whether Perwaiz's clinical privileges or medical staff membership at any hospital had ever been voluntarily or involuntarily suspended, revoked, restricted, or denied.  JA2493, SA7.  In response, Perwaiz answered "yes," his clinical privileges were suspended in 1996 due to his tax convictions, but he did not state anything

---

[1] Perwaiz also routinely lied about his date of birth on the applications, among other official documents.  JA7290–7291, JA7428, JA7540, JA7542–7549, JA8052, JA8105, SA1, SA20.

about the 1983 Maryview revocation.  JA2493, SA7.  He stated the same in a 2019 Optima health care insurance application.  JA1569–1573, JA2494–2495, SA35–36, SA40–41.  Perwaiz also falsely denied ever being convicted of a felony on the applications, claiming his tax convictions were misdemeanors.  JA1573, JA2503–2505, SA8, SA35–36, SA40–41.

### B.    Perwaiz's Scheme to Defraud

Perwaiz defrauded health care benefit programs, *i.e.*, insurance companies, of millions of dollars by billing them for medically unnecessary procedures in four principal ways.  First, he altered the estimated due dates of his pregnant patients so he could induce them earlier than medically necessary.  Second, Perwaiz persuaded women to undergo invasive and irreversible surgeries, such as hysterectomies, that were not medically necessary and fabricated the basis for the surgeries.  Third, Perwaiz routinely billed for two in-office diagnostic procedures that he did not actually perform, using fabricated results from the procedures to progress his patients to surgery.  Finally, Perwaiz performed sterilization procedures without waiting the 30-day period that Medicaid and the Code of Federal Regulations required after a patient's initial consent.  Instead, Perwaiz himself falsely backdated the sterilization forms he submitted to Medicaid, in some cases with dates that pre-dated a patient's first appointment with him.

In addition, Perwaiz defrauded the insurance companies by lying about his

background on his credentialing applications.

### 1.    Falsification of Estimated Delivery Dates

First, Perwaiz moved up pregnant women's due dates without medical indication to ensure he would be available to induce them at his convenience and thus bill for the deliveries.  He knowingly did so in direct contradiction of the long-standing medical standard of care, placing his patients and their babies at unnecessary risk of complications.

As background, doctors are required to provide services to patients within the "standard of care." JA523–524.  The standard of care is what is practiced across the United States and is based on medical literature and evidence-based medicine.  JA523–524.  Health insurance companies will only reimburse for services that are both within the standard of care and medically necessary.  JA122, JA632–635, JA639, JA1155–1159, JA1356–1359, JA1828–1832, JA8154, JA8161, JA8227, JA8607–8670.

Women can go into labor either naturally or by induction.  JA531.  If the induction is "elective," meaning there is no medical reason forcing the induction, the "gold standard rule" is that an OB/GYN never induces labor or performs an elective cesarean section prior to 39 weeks of gestation.  JA531.  The 39-week rule, which hospitals and insurance companies have also implemented, has been the standard of care since at least the 1970s.  JA531–532, JA2076–2082, JA2234–

6

2335, JA7398, JA9041–9053.  Elective inductions prior to 39 weeks can cause

significant risks to both the mother and baby and are not medically necessary.

JA1578, JA1161–1162, JA2234–2235.

Despite these established standards of care, Perwaiz routinely changed

estimated delivery dates ("EDDs", or "due dates") late in his patients' pregnancies

to weeks-earlier without any medical basis.  JA1515–1525, JA2826, JA2835,

JA7312–7314, JA7591–7593.  He handwrote these changes in the patients' files

and then scheduled elective inductions on days he already planned to be at the

hospital.  JA302, JA350–351, JA701–702, JA886, JA909, JA911, JA1093–1094,

JA1480, JA1705–1706, JA1763, JA2072, JA2381–2382, JA2425, JA3785,

JA3886–3904, JA3909–3914, JA3963–3968, JA4052–4059, JA4125–4129,

JA4228–4242, JA4244–4251.  Perwaiz kept track of the inductions on a sheet he

provided to his office biller.  JA924–926, JA7286–7289.  This practice ensured

Perwaiz, who had a packed surgical schedule, was the doctor who did the

deliveries and, therefore, could be paid by insurance.  And, by changing the due

dates, Perwaiz made it appear he was performing elective inductions within at least

39 weeks' gestation.

In 2019 alone, Perwaiz delivered babies for approximately 100 Medicaid

and Tricare insured patients.  JA2425.  Perwaiz induced the majority of these

patients into labor on Saturdays, when he had standing operating room time at

Chesapeake Regional Medical Center.  JA2425.  Of those 2019 patients, Perwaiz

electively induced 33 of the women prior to 39 weeks' gestation—including as

early as 37 weeks—without medical indications.  JA2235–2249, JA2423–2426,

JA3785–3786, JA3788, JA3798, JA3808, JA3811, JA3817, JA3821, JA3824,

JA3829, JA3850, JA3909, JA3912–3914, JA3916, JA3935, JA3938–3942, JA3945,

JA3954, JA3959, JA4052–4060, JA4073–4077, JA4079–4091, JA4228–4229,

JA4231–4242, JA4244–4252, JA9691–9693.

Perwaiz then fraudulently billed insurance companies for full-term and/or

medically necessary deliveries.  JA923–926, JA1434–1435, JA1579–1580,

JA2423–2428, JA3905, JA3918–3919, JA3972, JA4060, JA4130–4140, JA4144–

4145, JA4242, JA4252.  For just the 2019 deliveries, the insurance companies paid

Perwaiz approximately $49,000.  JA2427, JA9691–9693.  Besides his decades of

experience, Perwaiz clearly knew this was dangerous and against the standard of

care. Maryview had previously sanctioned him for performing preterm inductions

on several occasions between 2002 to 2006.  JA2428–2430, JA7467–7482.

## 2. Medically Unnecessary Surgeries Based on Falsified Symptoms

Perwaiz frequently performed unnecessary and invasive surgeries on his

gynecological patients on days hospital nurses called "Perwaiz-a-thons."  JA983,

JA1202, JA1731.  He would falsely tell patients they immediately needed to

undergo sterilizing hysterectomies and other procedures, sometimes falsely telling

8

patients they had cancer. He documented fake symptoms that women never claimed and made formulaic findings in their records in order to "paper" his reasons for surgery. Then, he would fraudulently bill insurance companies for these unnecessary, invasive, and sometimes injurious surgeries. JA645–649, JA1162–1164, JA1432–1434, JA1438–1439, JA1582–1587, JA1846–1850, JA4365, JA5021–5022, JA5100–5115, JA5210–5211, JA5306–5310, JA5380–5389, JA5391–5401, JA5448–JA5452, JA5502–5503, JA5689–5693, JA5701–5705, JA5987–5993, JA6370, JA6676–6677, JA8173–8174.

Examples were plentiful, including:

- In 2015, Perwaiz falsely told W.B. she had cancer and needed a hysterectomy. Perwaiz then performed a hysterectomy and another surgery on W.B. Perwaiz lied to insurance that W.B. had uterine prolapse and had complaints supporting this. W.B. never complained about these issues. JA1635–1650, JA2228, JA2274–2279, JA4348–4364, JA4366–4367.

- In 2016, A.N. saw Perwaiz for fertility issues. She recorded Perwaiz advising A.N. she needed numerous tests and procedures, insurance would not pay for them, but he would lie to insurance to make sure it was covered. Perwaiz performed numerous procedures on A.N. and falsely documented it was due to A.N.'s "abnormal uterine bleeding." JA1509–1510, JA1880–1893, JA2279–2284, JA4396–4409, JA4414–4420, GEX9M.

- In 2016, Perwaiz falsely told D.P. she had cancer and needed a hysterectomy, which he performed several days later along with another surgery. To support his claim to insurance, Perwaiz falsely stated D.P. complained of frequent vaginal bleeding. D.P. never complained of these issues and suffered severe pain after surgery. JA1331–1341, JA2288–2290, JA5070–5081.

- In 2016, Perwaiz falsely told S.N. she had cancer and needed a hysterectomy, which he performed several days later along with another surgery. To support his claim to insurance, Perwaiz falsely stated S.N. complained of pelvic and back pain and something protruding in her vagina. S.N. never complained of these issues. JA1259–1261, JA1299–1316, JA2227–2231, JA2291–2296, JA5190–5209.

- In 2018, Perwaiz falsely told W.H.W. she had cancer and needed a hysterectomy, which he performed. To support his insurance claim, Perwaiz falsely documented that the hysterectomy was necessary due, in part, to W.H.W.'s pelvic pain and other issues, which she did not have. JA2054–2062, JA2224–2231, JA2296–2300, JA5289–5305.

- In 2018, Perwaiz falsely told A.G. she had cancer and needed a hysterectomy. Perwaiz then performed a hysterectomy and another surgery. To support his insurance claim, Perwaiz documented the hysterectomy was necessary due, in part, to uterine prolapse. A.G. did not complain of symptoms involving uterine prolapse. JA2166–2175, JA2300–2305, JA5367–5379.

- In 2018, Perwaiz falsely told M.F. she had an ovarian cyst that would become cancerous if she did not get a hysterectomy, which he performed. To support his insurance claim, Perwaiz falsely documented the hysterectomy was necessary due, in part, to pelvic pain, fibroids, and a complex ovarian cyst. However, M.F. did not complain of any pain or symptoms involving fibroids, the cyst was not at risk of becoming cancer. JA895–896, JA1940–1973, JA2284–2290, JA4993–5020.

- In 2019, Perwaiz falsely told Y.S. she had fibroids that would become cancerous if she did not get a hysterectomy. Perwaiz then performed a hysterectomy and another surgery. To support his insurance claim, Perwaiz falsely documented the surgeries were necessary due, in part, to due to Y.S.'s symptomatic prolapse and irregular bleeding. However, Y.S. did not complain of symptoms of prolapse. JA761–790, JA897–900, JA2305–2310, JA5435–5447.

10

- In 2019, Perwaiz falsely told A.F. she needed a biopsy and was going to get cancer. Perwaiz then performed a biopsy and another procedure. To support his insurance claim, Perwaiz falsely documented A.F. wanted the biopsy. However, A.F. had a negligible risk of developing cancer, and he never offered biopsies. JA842, JA1051, JA1102–1110, JA2310–2313, JA5490–5501.

- In 2019, Perwaiz falsely told N.B. she would get cancer and needed a hysterectomy. Perwaiz then performed a hysterectomy and another surgery. To support his claim to insurance, Perwaiz greatly exaggerated N.B.'s symptoms. N.B. has been unable to use the bathroom normally since the surgeries. JA438–447, JA542, JA548–549, JA578–582, JA893–895, JA2313–2316, JA5534–5554.

- In 2019, Perwaiz performed a surgical hysteroscopy and other procedures on L.G. L.G. later returned to Perwaiz, who falsely documented L.G. had cramps and heavy bleeding and told L.G. she had uterine fibroids and needed surgery. He scheduled L.G. for surgery and submitted false information to the insurance company for preapproval. JA926–929, JA1386–1406, JA1508–1509, JA2317–2321, JA2490–2491, JA5668–5687, JA7552–7555, GEX25R.

- In 2019, D.B. went to Perwaiz due to intermittent bleeding. Perwaiz falsely told D.B. she was at risk for developing cancer and needed a hysterectomy, which he performed. To support his claim to insurance, Perwaiz falsely documented D.B. had pelvic pain. JA790–810, JA2321–2327, JA5962–5986.

Statistical evidence showed Perwaiz was a complete outlier from his peers in number of surgeries per patient. JA2525–2531, JA7749–7751, JA8606, JA9062–9080, JA9082–9084. On average, other OB/GYNs in Virginia performed gynecological surgeries on approximately 8% of their patients. JA1184–85, JA1855–1856. In contrast, Perwaiz performed surgeries on approximately 38-41% of his patients. JA1184–85, JA1855–1856. Thus, 79–80% of Perwaiz's surgeries

11

were outliers.  JA2528–2530.  The outlier surgeries resulted in over $1.8 million in

payments to Perwaiz from the insurance companies between 2010 and 2019.

JA7751.

### 3. Falsified In-Office Diagnostic Procedures (Hysteroscopies and Colposcopies)

Perwaiz also exploited insurance companies for payments for hundreds of

hysteroscopies and colposcopies allegedly performed in his office.  These medical

procedures were performed either 1) in such a non-standard way as to make them

worthless or 2) with broken instruments.

Hysteroscopes are medical instruments used to look for issues in the uterus.

JA562–570.  To use it correctly, a doctor must use either gas or liquid to distend or

"open" the uterus in order to see, and have a working light source.  JA563–565,

JA1139, JA362, JA2218.  Perwaiz, however, never used gas or liquid for his

hysteroscopies.  JA358–359, JA832, JA2416–2417.  Yet, he routinely pretended to

do them and then billed insurance.  JA4399–4404, JA4410–4411, JA4993–5011,

JA5021–5022, JA5070–5082, JA5100–5120, JA5289–5306, JA5367–5387,

JA5391–5401, JA5534–5552.

Further, in June 2016, Perwaiz performed hysteroscopies with a

nonfunctioning hysteroscope and then billed for the procedures, including for

patient A.M.B.[2]  JA360–361, JA832–841, JA1847, JA2411–2419, JA1139, JA876–877.  Perwaiz also progressed patients to unnecessary surgery, based on his "findings."  JA1607, JA2315, JA2414–2415.

Over the period of the scheme, Perwaiz received approximately $450,000 from insurance companies for hysteroscopies.  JA2418, JA8601–8605, JA9057–9061, JA9619–9675.  Here too he was an outlier: over 10% of his patients underwent his version of hysteroscopies, versus 1% of his peers.  JA1607, JA1374–1375, JA1852–1854.

Perwaiz also billed for fraudulent colposcopies.  Colposcopes are essentially a magnifying glass used to detect abnormalities on the cervix.  JA550–554.  In order to see any abnormal cells, a doctor must apply an acetic/vinegar solution to the cervix.  JA550–556.  If an abnormality is found, the standard of care is to first take an in-office biopsy to avoid higher risk hospital procedures.  JA557–559.  Perwaiz, however, never used acetic solution for his colposcopies.  JA363–364, JA841–842, JA1051–1052, JA1259, JA1554, JA1668–1669, JA2408.  After "performing" the colposcopies, Perwaiz mapped his false "findings" on diagrams that looked remarkably similar patient-to-patient and falsely denoted he observed

---

[2] Counts 11 to 13 and 41 to 43 charged additional patients during this period, however the jury found him not guilty of those counts.  JA76, JA82, JA3421, JA3426.

changes with acetic acid.  JA2779–JA2780, JA7586–7587.  Perwaiz also

progressed patients to the hospital for more invasive biopsies or unnecessary

surgeries.  JA2409–2410, JA2565–2566.

### 4.    Falsified Sterilization Consent Forms

Perwaiz also tricked insurance companies into paying for sterilizations by

backdating required consent forms.  Historically, underserved women were

pressured or manipulated into sterilizations.  JA585–587.  Thus, Medicaid now

requires a 30-day waiting period for women to electively undergo sterilization

procedures, typically known as bilateral tubal ligations ("BTL"), and will not

reimburse providers if they do not follow the 30-day rule.  JA335–340, JA584–587,

JA884–885, JA849–850, JA902–903, JA1361–1366.

Perwaiz told his sterilization patients to sign the Medicaid consent form, but

specifically told them not to date it; he would then back-date the forms himself so

they appeared to have been signed prior to 30 days before surgery.  JA336–338,

JA489–493, JA671, JA690–691, JA1286–1287, JA1361–1366, JA1978–1979,

JA5773–5774, JA5819–5824, JA5852–5855, JA5900, JA6242–6253, JA6819,

JA1454–1456, JA884–885, JA1064, JA1454.  Then, Perwaiz fraudulently billed

Medicaid for the procedures, as with patients A.P.C., D.W., T.C., and T.T.

JA1437, JA1581–1582, JA1845–1846, JA2419–2423, JA5775, JA5825–5827,

JA5860–5864, JA5866, JA5903–5908, JA6254–6256.  Some women had not even

been Perwaiz's patients for 30 days.  JA671–673, JA2419–2423.

### C.    The Superseding Indictment, Trial, and Sentencing

On June 19, 2020, a grand jury returned a sixty-two count superseding indictment ("indictment") alleging violations of three statutes, including health care fraud in violation of 18 U.S.C. § 1347 (Counts 1 through 26) and false statements related to health care matters in violation of 18 U.S.C. § 1035 (Counts 27 through 59).[3]  JA49–90.

The indictment charged Perwaiz's health care fraud scheme occurred from at least January 2010 to October 2019.  JA59.  The health care fraud counts pertained to twenty-one patients for procedures billed between November 2015 and October 2019.  JA59–79.  The false statements counts mirrored the health care fraud counts, and also included four counts pertaining to sterilizations (Count 27 through 29), a count pertaining to patient D.B. (Count 57), and two counts, Counts 58 and 59, concerning Perwaiz's false sworn provider applications to Anthem and Optima in 2017 and 2019 where he failed to disclose felony tax convictions and the Maryview suspension.  JA85–87.

---

[3]  The indictment also had three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A, one of which the government dismissed pretrial.  JA15, JA88.  The jury found Perwaiz not guilty on the remaining counts, and they are not relevant to the issues on appeal.  JA3428.

15

### 1. Evidence of Maryview Suspension and Felony Tax Convictions

Prior to trial, the government provided notice to Perwaiz under Rule 404(b) that it intended to introduce certain evidence, including the 1983 revocation of his Maryview privileges and his prior felony tax convictions.  JA130–131, JA148–154; *see also* JA115–119.  Perwaiz filed a motion *in limine* objecting to certain categories of evidence under Rules 404(b), 403, and Rule 609 .  JA129–141.  The government opposed the motion, in relevant part, because the evidence was intrinsic to the charged fraud scheme, specifically to the false statements Perwaiz made in the Anthem and Optima applications (Counts 58 and 59).  JA144, JA148–154.  The government also argued the felony tax convictions were admissible 1) as impeachment evidence, should Perwaiz testify, under Rule 609, 2) to rebut an offered character trait of honesty under Rule 404(a), and 3) as evidence of lack of accident, mistake, and proof of knowledge and intent under Rule 404(b).  JA148–150, JA115–119.

The district court heard argument on Perwaiz's motion near the close of the government's case, on the tenth and eleventh days of trial, in the middle of the testimony of its final witness.  JA2433–2481.  It sustained the objection to the admissibility of a 2010 Virginia Board of Medicine document regarding a complaint of a forced induction.  JA2433–JA2447.  The court overruled defendant's argument that while the fact of the Maryview revocation and tax

16

convictions were admissible, the details were not, finding the evidence relevant and reliable, intrinsic to Counts 58 and 59, and admissible under Rule 404(b) as to Perwaiz's lack of mistake or accident.  JA2462–2463, JA2471–2481.  Regarding the tax convictions, the court ordered redactions of the indictment so the jury would only see the two charges of which Perwaiz was convicted.  JA2461–2467; SA45–55.

### 2.    The Trial, Voluminous Evidence, and Verdict

Perwaiz's trial started on October 13, 2020, and lasted nearly five weeks.  JA16–20.  The government called 55 witnesses and introduced over 500 exhibits.  Of the witnesses, 26 were former patients (plus a mother of a former patient).  All the testifying patients were mentioned, and most were specifically named, in counts in the indictment.  Namely, the patient-witnesses included victims of unnecessary surgeries: N.B. Y.S., D.B., S.N., L.G., D.P., W.B., M.F., W.H.W., A.G., A.N., A.F., T.D.C., D.C., D.A., and M.C.; sterilization patients: A.P.C., D.W., T.C., D.B.D., and A.D.; and obstetric patients: A.C., A.B., B.P., C.L., and L.R.  JA434–479, JA487–508, JA663–670, JA715–739, JA739–824, JA1007–1046, JA1088–1117, JA1283–1351, JA1386–1426, JA1475–1496, JA1635–1666, JA1698–1726, JA1794–1809, JA1880–1927, JA1940–2068, JA2165-2187.  Perwaiz did not object to the testimony of any patients.  A few of the named victims in charged and ultimately convicted counts (A.M.B., H.M., and T.T.) did

17

not testify, but other witnesses, namely a special agent, expert witness, and insurance representatives, testified concerning their records and insurance claims. All these patients' medical records, or relevant excerpts thereof, were accepted into evidence.

The government also presented two experts: 1) an OB/GYN doctor, Dr. Jay Goldberg, who testified at length concerning medical terminology, standards of care and his review of patient records, JA508–617, JA2217–2372; and 2) Stephen Quindoza, who testified to Medicaid and Medicare policies and procedures, JA617–662.  In addition to Mr. Quindoza, the government called seven health insurance company representatives who provided billing documentation and evidence of their policies and procedures.  JA1178–1198, JA1557–1635, JA1149–1177, JA1351–1386, JA1426–1450, JA1601–1634, JA1825–1880.

Eight of Perwaiz's former employees, including nurses, billers, and an ultrasound technician, testified about their observations.  JA297–434, JA824–971, JA1046–1088, JA1239–1281, JA1450–1469, JA1496–1557, JA1666–1698.  Eight hospital personnel, including doctors and nurses, also testified, including to Perwaiz falsifying consent forms, patients' lack of understanding of their procedures and denial of symptoms, and Perwaiz's refusal to use a camera at surgery.  JA976–1007, JA1198–1227, JA1239–1283, JA1726–1755, JA1761–

18

1794, JA1809–1940, JA2068–2108, JA2372–2400.  Also, an employee from the

hysteroscope manufacturer testified about its broken condition.  JA1117–1149.

Two law enforcement officials also testified.  The first, Special Agent Danita

Lopes of the Defense Criminal Investigative Service ("DCIS") testified about her

review of the insurance claims and patient records, which resulted in a loss of over

$18,000,000 to insurance companies.  JA2187–2217, JA2400–2588, JA7589–

7590, JA7575–7582, JA7588, JA9081, GEX207.  The other, Forensic Accountant

Daniel Booth of the FBI, testified about his review of Perwaiz's personal finances

and luxurious lifestyle, including hundreds of thousands of dollars Perwaiz spent

on luxury vehicles, clothes, and gifts for his paramour (and office nurse).  JA2108–

2165, JA9575–9617, JA9694–9765.

Perwaiz presented two witnesses: an anesthesiologist who thought Perwaiz

was capable and competent, and Perwaiz himself.  JA2588–3104.  Perwaiz denied

falsifying patient symptoms and attempted to explain his decisions as based on his

vast experience rather than against sound medical judgment.  JA2621–3104.  He

did, however, admit to backdating the sterilization consent forms.  JA2710–2711.

The jury convicted Perwaiz of 52 of the 61 counts: 23 health care fraud

counts and 19 false statement counts.  JA3420–3429.  It found Perwaiz not guilty

of three fraud counts, three false statement counts, and both identity theft counts.

19

JA3420–3429.  The jury also failed to reach a verdict on a false statement count, which the district court dismissed on the parties' joint motion.  JA3425, JA20.

### 3.    Sentencing

At sentencing, Perwaiz maintained his innocence and made a general objection to everything in the Presentence Investigation Report (PSR).  JA3447–3448.  He also emphasized his age, positive performance on prior federal probation, and lack of ability to practice again.  JA3569–3570.  The government requested a sentence of 600 months.  JA3451, JA3558–3564.  The court received victim impact statements, both written and oral, from over sixty women, many of whom were emotionally and physically traumatized.  JA3542–3558, JA9885–10084.

Perwaiz's advisory Guidelines range was restricted to 5,700 months.  JA9877.  After reviewing all the relevant factors, the district court sentenced Perwaiz to 708 months' imprisonment.  JA3584, JA3744.  The court also found that Perwaiz's fraud caused over $18,000,000 in losses to insurance companies and ordered restitution.  JA3585.

This appeal followed.  JA3763.

### Summary of Argument

Perwaiz's first claim of error concerns the admission of two exhibits: 1) Exhibit 150, a letter to Perwaiz documenting his suspension of privileges at

Maryview Hospital in 1983, and 2) Exhibit 152A, a redacted indictment charging Perwaiz with filing false tax returns. He raises a challenge to Exhibit 150 under both Rule 404(b) and Rule 403. His challenge to Exhibit 152A is only under Rule 403.

These arguments are meritless because they ignore the direct, substantial, and unique probative value that Exhibits 150 and 152A had for two counts of the indictment, Counts 58 and 59. Those counts charged Perwaiz with failing to disclose his suspension of hospital privileges and prior tax convictions to two insurance companies. As the district court recognized, Exhibit 150 was intrinsic to those counts. Rule 404(b), which limits only extrinsic evidence, is therefore inapplicable. Because Perwaiz does not challenge this holding on appeal, this Court can affirm on that independent ground. Further, both exhibits had significant unique relevance to multiple elements of each count and minimal—if any—unfair prejudice that is cognizable under Rule 403. Even if Perwaiz could show an abuse of discretion, the admission of either exhibit was harmless in light of the overwhelming evidence.

Second, Perwaiz argues that the admission of testimony from six patient-witnesses not named in specific counts of the indictment violated Rule 404(b). However, this claim is subject to plain error review, and this Court's precedent squarely forecloses his claim under any standard because the patients' testimony

21

was intrinsic evidence of the scheme to defraud.

Finally, Perwaiz contends he was provided with ineffective assistance of counsel at sentencing. Here, Perwaiz faces an extremely high bar because he must show ineffective assistance conclusively apparent on the record. Further, because Perwaiz urges the Court to presume he was prejudiced, he must also show a complete denial of counsel. Perwaiz cannot meet either standard.

Accordingly, this Court should affirm the judgment.

## Argument

### I. There was no abuse of discretion in admitting certain evidence of Perwaiz's suspension of hospital privileges and tax convictions.

Evidentiary rulings that were preserved below are reviewed for abuse of discretion. *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997). Under that standard, this Court will only reverse a district court's ruling if it was "arbitrary or irrational." *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir. 1988). Such rulings are also subject to harmless error review under Federal Rule of Criminal Procedure 52. *See United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995).

### A. The district court did not abuse its discretion in admitting evidence of Perwaiz's suspension of hospital privileges, Exhibit 150, under either Rule 404(b) or Rule 403.

First, Perwaiz challenges the district court's admission of Exhibit 150, a letter from the Virginia Board of Medicine documenting Maryview's 1983 termination of his privileges to practice at the hospital. JA7484. Perwaiz argues

22

that the district court abused its discretion in admitting this exhibit under Rules

404(b) and 403.

### 1.    Rule 404(b) presented no bar to the admission of Exhibit 150.

While Perwaiz contends that the admission of Exhibit 150 violated Rule

404(b), that rule is "only applicable when the challenged evidence is extrinsic, that

is, separate from or unrelated to the charged offense." *United States v. Bush*, 944

F.3d 189, 195 (4th Cir. 2019).[4]  "[A]cts intrinsic to the alleged crime do not fall

under Rule 404(b)'s limitations." *United States v. Chin*, 83 F.3d 83, 87–88 (4th

Cir. 1996).  As direct evidence of Perwaiz's past suspension of privileges at

Maryview, Exhibit 150 constituted intrinsic evidence for Counts 58 and 59, which

charged him with lying about that suspension.  Thus, it was not subject to Rule

404(b) at all.

The district court ruled Exhibit 150 admissible on multiple bases, including

its relevance to Counts 58 and 59, and under Rule 404(b).  While hearing argument

regarding Exhibit 150, the Court initially queried whether it was "relevant … to an

actual charge," JA2475, but it ultimately found that Exhibit 150 was "relevant to

the charge of suspension of privileges, as well as to being relevant under 404(b)."

---

[4] The government has omitted internal quotation marks, alterations, and citations throughout this brief, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

JA2480–2481.  On appeal, Perwaiz does not make any argument regarding the

district court's finding that Exhibit 150 constituted evidence intrinsic to the false

statement charges.  Because he challenges only one of the two bases for Exhibit

150's admissibility, "he has waived appellate review of that separate ground for

denying his motion, and [this Court can] affirm on that basis." *United States v.*

*Ebert*, 61 F.4th 394, 402 (4th Cir. 2023); *see also* Fed. R. App. P. 28(a)(8)(A).

Even if the Court finds no waiver, the government clearly preserved this

argument below, JA151–152, JA2455, and this Court may affirm the admission of

Exhibit 150 on any basis in the record.  *United States v. Flores-Granados*, 783

F.3d 487, 491 (4th Cir. 2015).   To the extent Exhibit 150 was extrinsic evidence,

the district court did not abuse its discretion in finding it satisfied Rule 404(b).

### a.  Rule 404(b) is inapplicable because Exhibit 150 was intrinsic to Counts 58 and 59.

Evidence of Perwaiz's past suspension of hospital privileges was squarely

intrinsic to Counts 58 and 59, which charged Perwaiz with making false statements

to Anthem (Count 58) and Optima (Count 59), in violation of

18 U.S.C. § 1035(a)(2).  JA86–87.  The government alleged that Perwaiz's

periodic provider applications to those health insurance companies in 2017

(Anthem) and 2019 (Optima) required him to disclose whether his clinical

privileges or medical staff privileges had ever been suspended or revoked.  JA85–

87.  The government further alleged that in completing those applications, Perwaiz

failed to disclose that his privileges had been suspended at Maryview in 1983. JA85–87.

At trial, Anthem and Optima representatives introduced the applications and testified that Perwaiz did not disclose Maryview's 1983 revocation. Melinda Matzell, a senior investigator at Anthem, JA1825, testified that doctors must apply to become an in-network provider and are required to regularly recredential. JA1833. Ms. Matzell explained the purpose of this process was because "we only want to recommend these providers that meet the standards." JA1834. She reviewed Exhibit 58, Perwaiz's recredentialing application from 2017, and testified that although the application required Perwaiz to disclose any past hospital privilege suspensions, he did not disclose any from 1983. JA1836–1838; SA7. Similarly, Edward McCormick of Optima Health, JA1557, testified that Optima requires doctors to initially apply and then periodically recertify, JA1567–1568. He reviewed Exhibit 59, Perwaiz's last recredentialing application in 2019, and testified that although the application required Perwaiz to disclose any past suspension of privileges at a hospital, Perwaiz did not disclose any 1983 suspension. JA1570–1572, SA35, SA40.

This Court has explained that evidence is considered "intrinsic" where it "is inextricably intertwined with the evidence regarding the charged offense," "serves to complete the story of the crime on trial," or where the prior and charged "acts

are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Bush*, 944 F.3d at 196.  Evidence is also intrinsic "if it is necessary to provide context relevant to the criminal charges." *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009).

Exhibit 150 satisfies each of those criteria because it was direct and important evidence of multiple elements of Counts 58 and 59.  *See United States v. Brizuela*, 962 F.3d 784, 796 (4th Cir. 2020) (noting evidence is necessary to complete the story where it "offer[s] facts that were necessary to prove a specific element of a charged offense").  The jury was instructed that to prove a violation of § 1035, the government had to prove three elements: that Perwaiz 1) made a materially false statement or representation, 2) acted knowingly and willfully, and 3) made a statement in a matter involving a healthcare benefit program.  JA3300. Exhibit 150 was highly relevant to proving the first and second elements: it showed the falsity of Perwaiz's disclosures, that such disclosures were material, and that he acted knowingly and willfully.

First, in order to prove that Perwaiz's answers on the Anthem and Optima recredentialing applications were false, the government had to prove Maryview revoked Perwaiz's privileges in 1983.  Exhibit 150, a letter from the Virginia Board of Medicine to Perwaiz, does just that:

> 1.  Your staff membership and clinical privileges at Maryview Hospital were terminated on October 24, 1983, due to poor clinical judgment, unnecessary surgery, lack of documentation, and discrepancies in recordkeeping, to-wit:

JA7484.  Second, because it was the only exhibit with specific details of the basis

for Perwaiz's suspension, Exhibit 150 was also highly relevant to materiality—that

is, whether Perwaiz's failure to disclose has "a natural tendency to influence, or

[is] capable of influencing" Optima and Anthem in their credentialing process.

*United States v. Gaudin*, 515 U.S. 506, 509 (1995), JA3302.

Particularly important regarding materiality, both Ms. Matzell and Mr.

McCormick testified that providers were required not only to disclose the *fact* of a

suspension, but also to explain the *details* of any suspension, and that such

additional information would be used in recredentialing decisions.  JA1837

(Matzell), JA1571 (McCormick), SA7 (Anthem application), SA35–36 (Optima

application stating "For any 'Yes' response, prove an explanation on the

Supplemental Disclosure Question Explanation Form").  This testimony shows

how Exhibit 150 was "inextricably intertwined" with Counts 58 and 59.  *See*

*United States v. Lighty*, 616 F.3d 321, 354 (4th Cir. 2010) (noting "evidence is

inextricably intertwined…if it forms an integral and natural part of the witness's

account of the circumstances surrounding the offenses").  Without the details

contained in Exhibit 150—including fourteen surgeries and procedures which

Maryview had deemed contrary to sound medical judgment or prematurely

diagnosed—the government would be deprived of important evidence to prove to the jury *why* this more than 30-year-old suspension of privileges at a hospital would have mattered to Anthem and Optima.  JA7484–7486.

Finally, Exhibit 150 was also important evidence to show that Perwaiz's non-disclosure was knowing and willful.[5]  As a letter to Perwaiz, it showed he knew of his privilege suspension.  JA7484.  And the *details* of the reasons for his suspension in that letter—which reflect an extensive investigation—were relevant to show that his failure to disclose was not simply an oversight.  Perwaiz had argued in his opening statement that the failure to disclose could have been a simple mistake by a staff member.  JA294–295; *see also* JA2840–2841.  But as the district court pointed out in considering whether to admit Exhibit 150, that "somebody has had all of this investigation" is relevant to whether "someone could overlook losing their privileges."  JA2479.  It thus provided important context to Counts 58 and 59.  *Basham*, 561 F.3d at 326.

As "relevant and direct evidence" in proving multiple elements of charged offenses, Exhibit 150 did not "fall within the reach of Rule 404(b)."  *United States v. Logan*, 593 F. App'x 179, 183 (4th Cir. 2014).  Thus, there can be no abuse of discretion based on Rule 404(b).

---

[5] To prove he acted willfully, the government had to show Perwaiz acted "purposely" and "with a bad purpose to disobey or disregard the law."  JA3281.

### b. Even if extrinsic evidence, Exhibit 150 satisfies Rule 404(b).

Evidence of prior wrongs is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, "Rule 404(b) is viewed as an inclusive rule," and allows evidence admissible for other purposes, including to show motive, opportunity, intent, preparation, or plan. *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008); Fed. R. Evid. 404(b)(2). To be admissible under any theory, the prior act evidence must be "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *Siegel*, 536 F.3d at 317. Assuming it is not intrinsic evidence, Exhibit 150 satisfies all three prongs.

### i. Exhibit 150 was relevant.

As this Court has held in the context of the Rule 404(b) inquiry, "the threshold for relevancy is relatively low" and "requires only a finding that the evidence be worth consideration by the jury or have a plus value." *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998). Evidence need only be "sufficiently related to the charged offense." *Id.*

Here, the district court correctly held Exhibit 150 relevant for two non-character purposes. First, it held that the details contained in Exhibit 150 "show that there's … an absence of mistake or lack of accident" in Perwaiz's failure to disclose his loss or privileges, because that "somebody has had all of this

29

investigation" is relevant to Perwaiz's claim "that they can't remember or it may have been an oversight." JA2479.[6] Further, as the court noted, Perwaiz "presented through cross-examination of the witnesses that this was just an oversight, that somebody else filled in these forms, and he just didn't mention it." JA2471. Where Perwaiz himself invited the contested evidence, there is no Rule 404(b) violation. *United States v. McLaurin*, 764 F.3d 372, 383 (4th Cir. 2014).

On appeal, Perwaiz does not dispute this finding. Def. Br. 22–23. Thus, as with the intrinsic evidence discussed above, he has waived his claim of error as to the relevance of Exhibit 150 by failing to challenge an alternative ground supporting the district court's admission of the document. *Ebert*, 61 F.4th at 402. Even if not, he cannot show any abuse of discretion in this aspect of the district court's ruling.

The district court also held that Exhibit 150 was relevant for another non-character purpose: to show Perwaiz's intent with regards to patients who testified that they didn't want certain procedures, or that Perwaiz didn't sufficiently explain the procedures to them. JA2476. As the court noted, throughout the trial there had been "continued cross-examination that the women who have come forward are

---

[6] Contrary to defendant's assertion that the district court only found Exhibit 151 relevant to Counts 58 and 59, Def. Br. 21–22, the district court also made this finding for Exhibit 150. JA2478–81.

not being truthful." JA2479; *see also* JA450–451, JA459–460, JA704–705, JA753–754, JA815–816, JA1044–1045, JA1110–1111, JA1327–1328, JA1420–1421, JA1654–1658, JA1662, JA1723–1724.

"[A] high degree of similarity between the prior acts and the act with which [defendant] was charged supports the finding that the acts were relevant to intent." *Queen*, 132 F.3d at 997. Exhibit 150 details twelve incidents where Perwaiz performed a hysterectomy without appropriate indications and contrary to sound medical judgment. JA7484–7486. Those findings bear a marked similarity to ten of the fraud counts and eleven of the false statement counts, which alleged Perwaiz performed medically unnecessary hysterectomies based on falsified patient symptoms.[7] Thus, Exhibit 150 was relevant in showing Perwaiz's intent, particularly in light of his prior suggestions in the trial that patient-witnesses were not being truthful. *See, e.g.*, JA 460–463, JA1659–1661, JA1969 –1970, JA289.

Perwaiz does not dispute the district court's finding that the credibility of the patient-witnesses was contested, but instead contends that Exhibit 150 lacks relevance because it contains "allegations" that are not "true," and because it pre-dated Perwaiz's charges by decades. Def. Br. 22–23. The claim that Exhibit 150 contains untruthful allegations lacks support in the record. The exhibit is a letter

---

[7] Counts 8, 14–16, 18–22, 24, 38, 44–46, 48–52, 54, 57.

from the Virginia Board of Medicine, and Perwaiz stipulated it was authentic. JA123. There was no showing at the trial that it did not accurately represent what Maryview had in fact found in its investigation: as the district court noted, that was self-evident from the face of Exhibit 150. JA2478–2479. And Exhibit 149—the admission of which Perwaiz did not challenge below—states that his "privileges were terminated by action of the Maryview Board of Directors after receiving recommendations from appropriate Medical Staff committees." JA7483. Further, other than Perwaiz's own self-serving testimony later in the trial, there was also no evidence that Maryview's findings were inaccurate. JA2638–2639. Even Perwaiz admitted Exhibit 150 accurately reflected patients' allegations, and agreed that there were problems with his "recordkeeping." JA2638–2639.

Perwaiz also argues the information in Exhibit 150 lacks relevance because it occurred decades before the charged offenses. Def. Br. 23. But this ignores Perwaiz's own defense at the trial which placed his *entire* career at issue. Perwaiz pointed strenuously to his decades of practice and thousands of patients he had treated over 40 years, as a contrast to the number of patients who testified at trial. JA2566–2567; *see also* JA2654–2655. Here are some examples from his opening statement, days before the district court made its contested ruling:

> [Y]ou are going to hear evidence that Dr. Perwaiz practiced medicine for almost 40 years.... He has seen thousands, if not tens of thousands of patients. They are going to bring you a few dozen, 25 or so.

32

> [I]f his practice is a pie, you have about 1/100th of one slice that they are going to ask you to draw these conclusions on.
>
> You have to always keep in mind, they are going to bring you 25 or 30 cases of people that are now complaining … out of tens of thousands of patients.
>
> [A]t its base what this case is really about is seeing this very narrow … slide of patients.  They are going to ask you to basically conclude that the last 40 years of this man's life has been a scheme and a scam ....
>
> Hospitals credential doctors.  Hospitals watch doctors.  Patients watch their doctors....  So you ask yourself … when did somebody complain?

JA285–286, JA289–290, JA293; *see also* JA296.

Thus, Perwaiz himself who made the timeframe of Exhibit 150 relevant, by arguing that decades of unblemished practice where no one complained—including hospitals specifically—negated the government's evidence.  *See* JA2475 (district court observing the defense strategy that "over and over it's been presented that these were just a small number of cases").  Where Perwaiz has himself opened the door to the contested evidence, there can be no Rule 404(b) violation.  *McLaurin*, 764 F.3d at 383.

### ii.  Exhibit 150 was necessary.

Exhibit 150 was also necessary evidence.  Evidence is necessary when it is "probative of an essential claim or an element of the offense," and courts must consider it in "light of other evidence available to the government."  *Queen*, 132 F.3d at 997–98.  Perwaiz points to two other exhibits regarding the Maryview

suspension, Exhibits 149 and 151. Def. Br. 23. While "if the Rule 404(b) evidence is entirely cumulative to other non-Rule 404(b) evidence available to the government, the Rule 404(b) evidence may not meet the necessity prong," Exhibit 150 included unique evidence that was not contained in Exhibits 149 and 151. *Lighty*, 616 F.3d at 354. It is the only one of the three exhibits demonstrating Perwaiz's direct knowledge of his Maryview suspension because it is addressed to Perwaiz himself. Exhibit 149 is a letter between two hospital administrators. JA7483. Although Exhibit 151 is a letter to Perwaiz, it references only an action by the Board of Medicine, not the Maryview suspension. JA7488. Exhibit 150 is also the only one of the three exhibits that contains the reasons for Maryview's suspension, information important both for the materiality, knowledge, and willfulness elements of Counts 58 and 59, and to show his intent with respect to unnecessary hysterectomies, as discussed above.

### iii. Exhibit 150 was reliable.

Finally, Exhibit 150 also meets the reliability prong, which requires only that evidence "should be submitted to the fact finder unless it is so preposterous that it could not be believed by a rational and properly instructed juror." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996). As the district court noted, Exhibit 150 "is an official document from the Department of Health." JA2475. Its authenticity was stipulated. JA123. And Exhibit 149, which defendant agreed was

admissible, shows the findings occurred following review by Maryview's Board of Directors and various committees. JA2467, JA7483. While Perwaiz disputed the accuracy of Maryview's findings when he testified, JA2638–2639, "[t]estimony is not unreliable simply because it is in conflict with or contradicted by other testimony." *United States v. Bailey*, 990 F.2d 119, 123 (4th Cir. 1993).

Perwaiz also claims Exhibit 150 is unreliable because the Maryview findings "did not form the basis of the censures described in Government Exhibit 151." Def. Br. 23. Perwaiz appears to misapprehend that there were two separate proceedings: Maryview's internal investigation which ultimately led to Perwaiz's suspension of privileges *at that hospital*, JA520–521, and then a subsequent independent proceeding regarding Perwaiz's medical license to practice in Virginia before the Board of Medicine, which regulates doctors under the state's professional rules of conduct. There is no evidence that the Board's censure somehow undermined the investigation at Maryview or found anything therein inaccurate. Indeed, Exhibit 151, which documents the board's later censure of Perwaiz, references "lack of documentation of patient records," JA7488, an affirmation of Exhibit 150's express reference to "discrepancies in recordkeeping." JA7484.

35

**2.    The district court did not abuse its discretion under Rule 403 in admitting Exhibit 150.**

Perwaiz also contends Exhibit 150 should have been excluded under Rule 403, which provides that "[t]he court may exclude evidence if its probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. The district court's ruling that any prejudice in Exhibit 150 was "outweighed by the probative value," JA2481, is subject to review for abuse of discretion, JA137, requiring him to show the district court was "arbitrary and irrational." *United States v. Weaver,* 282 F.3d 302, 313 (4th Cir. 2002). "Where the evidence is probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Lentz,* 524 F.3d 501, 525 (4th Cir. 2008).

Evidence that "goes directly to elements of the offense" is considered "highly probative." *United States v. Miller*, 61 F.4th 426, 431 (4th Cir. 2023). As discussed above, Exhibit 150 established multiple required elements of Counts 58 and 59: 1) the falsity of Perwaiz's failure to disclose, because the letter established he had in fact been suspended; 2) materiality, because insurance required an explanation of any suspension; and 3) that Perwaiz acted knowingly and willfully, because the letter was addressed to Perwaiz, and because the details indicated a substantial investigation that Perwaiz would have been unlikely to forget. *Supra* Parts I.A.1.a, I.A.b.i.

36

Particularly important, neither of the related exhibits 149 and 151 could have established materiality or Perwaiz's knowledge and intent because neither contained details of the suspension, and neither informed Perwaiz of the suspension. *Miller*, 61 F.4th at 431 (holding that "alternative evidence only discounts the value of the item first offered if the alternative has substantially the same or greater probative value"). And although Perwaiz does not press this point on appeal, his offer below to stipulate to the fact of the past suspension did not impact Exhibit 150's probative value, both because he did not offer to stipulate to materiality or knowledge and intent, and also because "defendant cannot stipulate away the government's case." *Id.*, JA2472.

This significant probative value is not substantially outweighed by any unfair prejudice. "Evidence that is highly probative invariably will be prejudicial to the defense," as the district court recognized. *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998), JA2481. But prejudice stemming from evidence directly establishing elements of an offense is not "unfair" within the meaning of Rule 403. *Id.* Thus, the district court did not err, let alone abuse its discretion.

Principally reiterating his Rule 404(b) arguments as to relevance and reliability, Perwaiz contends Exhibit 150 had little probative value because it contains "unsubstantiated allegations" from 1983, and that it was prejudicial because it suggested Perwaiz had a lengthy history of fraudulent conduct. Def. Br.

37

25.  Not only are these arguments unavailing, but they completely ignore Exhibit 150's relationship with Counts 58 and 59, as to which it had uniquely strong probative value and no unfair prejudice.

Further, the fact and details of Perwaiz's 1983 suspension also had probative value to establish Perwaiz's intent in the counts pertaining to unnecessary surgeries and in particular unnecessary hysterectomies, as the district court recognized. JA2476; *supra* 30–31.  Perwaiz contends Exhibit 150 lacks probative value because of its age, but having placed his decades of medical practice at issue at trial in the first instance, *supra* 32–33, Perwaiz cannot now argue that similar conduct in 1983 lacked probative value.  Perwaiz also calls the allegations in Exhibit 150 "unsubstantiated."  But as noted above, there was no dispute at trial that Exhibit 150 accurately represented Maryview's findings, reached after review by its Board of Directors and various medical committees.  JA7483; *supra* Part I.A.1.b.iii.

Perwaiz does not point to any cognizable "unfair" prejudice.  Even if he did, any prejudice would have been appropriately limited for numerous reasons.  First, through the testimony of Special Agent Lopes, Perwaiz was able to show that although his privileges at Maryview remained suspended, the Virginia Board of Medicine did not ultimately suspend Perwaiz's medical license based on the Maryview proceedings.  JA2502, JA2535–2536.  On cross-examination, counsel

38

also elicited that Perwaiz's privileges at another hospital, where the vast majority of Perwaiz's inpatient surgeries occurred, were not suspended at that time and remained in good standing until his arrest in 2019.  JA2536–2537.

Second, any additional prejudice resulting from Exhibit 150 was necessarily limited because there is no dispute that Exhibits 149 and 151 were properly in evidence[8] or that the government was entitled to introduce evidence that Maryview had suspended Perwaiz's privileges.[9]  JA2465.   Finally, as this Court has held, "[t]he danger of prejudicial effect subsides when the district court gives proper limiting instructions."  *United States v. Faulls*, 821 F.3d 502, 508 (4th Cir. 2016). The district court did just that here, instructing the jury that it "heard evidence that the defendant committed certain acts that may be similar to acts charged in the superseding indictment," and that it "may not consider this evidence in deciding if the defendant committed the acts charged."  JA3283.

---

[8] Perwaiz agreed below to the admission of Exhibit 149, JA2467; while he disputed the admissibility of Exhibit 151, JA2468–2469, he does not do so here.

[9] Below, Perwaiz also objected to Exhibit 150 because it documented a sexual relationship with a patient.  JA2476.  He does not press this argument on appeal, and there would be no additional prejudice in any event because that relationship was also documented in Exhibit 151, JA7488, and other testimony at trial contained similar evidence, JA2477–2478, none of which is contested on appeal.

## B.   The district court did not abuse its discretion under Rule 403 in admitting Exhibit 152A.

Perwaiz also raises a Rule 403 challenge to another exhibit, Exhibit 152A, a redacted copy of an indictment charging him with signing and filing false tax returns.  SA45–55; Def Br. 26.  After hearing argument, the district court ruled it admissible in light of Perwaiz's agreement that closely related documents—namely Exhibits 153 through 155 (the plea agreement, statement of facts and judgment, respectively) JA7510–7527—were admissible to establish Perwaiz's prior tax convictions, such documents were "meaningless" without the indictment. JA2460–2461.  This ruling is subject to review for abuse of discretion.[10]  JA134, JA2460.  Under that standard, this Court should overturn a Rule 403 determination only "under the most extraordinary circumstances, where [its] discretion has been plainly abused."  *United States v. Udeozor*, 515 F.3d 260, 265 (4th Cir. 2008).

In "reviewing the district court's decision to admit evidence under Rule 403," this Court "must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect."

---

[10] Although defendant did not orally cite Rule 403, JA2456–59, his pretrial motion raised a Rule 404(b) challenge to evidence about defendant's prior tax conviction and framed it as incorporating Rule 403.  JA132. To the extent the district court likewise did not expressly reference Rule 403 or the factors discussed herein, JA2462–63, this Court may affirm on any basis apparent in the record. *Flores-Granados*, 783 F.3d at 491.

*Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 350 (4th Cir. 2014).  Under any standard, the indictment was highly probative for two principal reasons.  First, just like Exhibit 150, it went directly to multiple elements of Counts 58 and 59, because the Anthem and Optima applications also required Perwaiz to disclose criminal convictions.  JA1838–1842, SA8, JA1572–1573, SA36.   In particular, the indictment was important evidence proving the materiality of Perwaiz's false disclosures regarding his 1996 convictions, as well as his knowledge and intent.  JA3300.

As to materiality, while other agreed exhibits—namely the judgment and plea agreement, Exhibits 153 and 155—established the falsity of Perwaiz's disclosures, the indictment was unique evidence about why the false disclosures would have mattered to Anthem and Optima, because it alone contained details of Perwaiz's convictions.  As both Anthem and Optima witnesses testified, the forms required Perwaiz to not only disclose past felony convictions, but also to explain further if a felony conviction was identified.  JA1573 (Optima), JA1839 (agreeing that "[t]he reason that Anthem requires an explanation is because those details are relevant").  The relevant portion of Optima's form is excerpted below, showing the requirement of an explanation in the left-hand column:

| Section 8 | Disclosure Questions (Continued) |
|---|---|
| **Disclosure Questions**<br><br>Answer all questions. For any "Yes" response, provide an explanation on the Supplemental Disclosure Question Explanation Form on page 34. | **MALPRACTICE CLAIMS HISTORY**<br><br>19.  X  YES  ☐ NO   Have you had any professional liability actions (pending, settled, arbitrated, mediated or litigated) within the past 10 years?*<br>If yes, provide information for each case.<br><br>**CRIMINAL/CIVIL HISTORY**<br><br>20.  ☐ YES  X  NO   Have you ever been convicted of, pled guilty to, or pled nolo contendere to any felony?* |

SA36.

Because the statement of facts incorporated by reference the factual allegations in the indictment but did not itself include a factual recitation, JA7522, the indictment alone included details showing that Perwaiz's tax convictions were closely tied to his medical practice.  SA49.

In addition to materiality, Exhibit 152A was also uniquely probative as to Perwaiz's knowledge and intent.  Like the other tax conviction exhibits, it showed Perwaiz's knowledge of his past convictions, but unlike those exhibits, was distinct evidence rebutting Perwaiz's defense that his omissions on the credentialing forms were oversights.  *Supra* 26–28, 29–30.   It details complex charges based on numerous distinct activities by Perwaiz.  As the district court reasoned, "[y]ou wouldn't overlook mentioning a felony when you have all this information."  JA2471.  *See United States v. Blake*, 571 F.3d 331, 348 (4th Cir. 2009) (holding in a Rule 403 challenge that finding that "defense counsel opened the door" to certain questioning by raising the issue in the first instance "was clearly within the district court's discretion").  Further, as the government argued below, the tax conviction

was also probative to the defendant's honesty, a pertinent character trait. JA116, JA2453. When Exhibit 152A was introduced, the defense had already elicited through cross-examination opinion testimony on defendant's honesty, and information on the falsity of defendant's tax returns was relevant rebuttal evidence. JA1622–1623. Fed. R. Evid. 404(a)(2)(A).

Exhibit 152A also did not create any unfair prejudice that substantially outweighed its significant probative value. Perwaiz argues it "played into the Government's narrative that Perwaiz engaged in fraud to fund a lavish lifestyle," but any prejudice was substantially mitigated in several respects. Def. Br. 26–27. First, unlike a case where the Rule 403 argument pertains to allowing evidence of a past conviction *at all*, here, there is no dispute that the jury would learn that Perwaiz had past felony tax convictions. Second, the district court granted Perwaiz's request to redact the portions of the indictment that pertained solely to other counts of which Perwaiz was not convicted. JA2463. Third, the district court gave the jury a limiting instruction. JA3283. *Faulls*, 821 F.3d at 508. Finally, because an agreed exhibit, the statement of facts, expressly incorporated the indictment, JA7522, its exclusion would risk creating the very dangers Rule 403 is designed at guarding against: "confusing the issues [and] misleading the jury." Fed. R. Evid. 403. As the district court observed, "if there is no objection to the statement of facts, the statement of facts, in order to have meaning, would have

43

to have the indictment."  JA2461.

### C.    Any error in admitting Exhibits 150 or 152A was harmless.

"Evidentiary rulings are subject to harmless error review under Federal Rule of Criminal Procedure 52, such that in order to find a district court's error harmless, [this Court] need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."  *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010).

It is clear from the entirety of the record below that the admission of either Exhibit 150 or Exhibit 152A, or both, did not "substantially sway" the jury's guilty verdicts.  First, there was and is no dispute that the jury would learn that Perwaiz had been convicted of two felony tax counts and that his privileges were suspended at Maryview, given Counts 58 and 59.  The contested additional *details* of those past incidents were important evidence for Counts 58 and 59, as explained above.  But any marginal impact of those additional details on all of the other counts is dwarfed by the other voluminous, substantial, and overlapping evidence presented at trial.  Further, as discussed above, the impact of both exhibits was reduced by the district court's redaction of Exhibit 152A, defense counsel's cross-examination regarding Exhibit 150, and the limiting instruction.

44

Second, evidentiary errors are considered harmless "where there is a significant amount of evidence which inculpates a defendant independent of the erroneous [evidence]." *Id.* at 295. Because there was "overwhelming evidence" to support the jury's verdict, any error in the admission of Exhibits 150 or 152A was harmless. *United States v. Billingsley*, 192 F. App'x 201, 204 (4th Cir. 2006). As described in the Statement of the Case above, incorporated herein, the trial was lengthy and involved twelve days of testimony of 55 witnesses, during which over 6,000 pages of 500 government exhibits were received into evidence.

The evidence at trial fell into four "sub-schemes" of the scheme to defraud: 1) early inductions of pregnant patients,[11] 2) unnecessary surgeries based on falsified patient symptoms,[12] 3) falsified diagnostic procedures,[13] and 4) backdated sterilization consent forms.[14] Each sub-scheme was supported by significant evidence, some of which is highlighted here:

Falsified due dates

- Patients A.C., A.B. (and her mother), B.P., C.L., and L.R. testified that Perwaiz induced them before their original due dates. Each of their medical records showed the altered due date Perwaiz added with

---

[11] Counts of conviction 1–7, 31, 33–37.

[12] Counts of conviction 8–9, 14–26, 38–39, 44–59.

[13] Counts of conviction 10 & 40.

[14] Counts of conviction 27–30.

his characteristic dot between month and day.  JA3890, JA3912, JA3966, JA4055, JA4125, JA4237, JA4244.

- Perwaiz's ultrasound technician of seven years, Courtney Ciccone, reviewed the patient records underlying each obstetric count and testified she observed Perwaiz changing the due dates she had initially determined, always moving them earlier and for no medical reason. JA1515–JA1526.

- Perwaiz's long-term employees Lisa Strong, JA350–JA352, Diane Coleman, JA907–JA908, as well as Jessica Medina, JA1055–1057, and Ashley Cotton, JA1250, testified to observing Perwaiz moving up patients' due dates to make it appear that they were 39 weeks when he induced them.

- Dr. Goldberg testified to his review of the obstetric records, JA2226–JA2249, that a due date shouldn't change after it's initially determined, and that inducing before 39 weeks without medical justification is medically unnecessary.  JA531–532.

- Dr. Moncla, vice-chief of the OB/GYN department at the hospital where Perwaiz induced his pregnant patients, testified that he complained to the FBI when he noticed Perwaiz's deliveries appeared to always cluster on the same day of the week.  JA2075–JA2077.

- Dr. Dillender, a pediatric neonatologist, testified Perwaiz's practice of delivering babies too early was called the "Perwaiz special."  JA2381.

- Insurance representatives testified elective inductions prior to 39 weeks of gestation was medically unnecessary and not compensable. *E.g.*, JA1161, JA1578.  They also reviewed the claims for obstetric patients showing false billings for 39-week deliveries.  *E.g.*, JA1435, JA1440.

- Special Agent Lopes testified to locating 33 obstetric records from 2019 involving induction prior to 39 weeks with altered due dates. JA2426.

46

<u>Unnecessary surgeries</u>

As described in detail in the Statement of the Case, *supra* B.2, numerous patients testified that they did not complain of the symptoms Perwaiz wrote in their medical records.  Dr. Goldberg reviewed each patient medical record and testified the surgeries were medically unnecessary, and that Perwaiz's statements to many of them about cancer were false.   JA2249–2327.  Ultrasound tech Ciccone also testified the patient complaints Perwaiz wrote were different from patient reports 25 to 50 percent of the time.  JA1504.  Hospital employee Diane Lee testified that when they came in for surgery, Perwaiz's patients denied symptoms Perwaiz had documented "[o]n a regular basis."  JA1734–1735.  Other hospital employees testified to Perwaiz altering consent forms after procedures.  JA1814–1816.

Evidence supporting charges for two patients in this group, L.G. and A.N., included recordings of Perwaiz himself.  A.N. surreptitiously recorded a video of an appointment with Perwaiz for fertility issues, where Perwaiz tells A.N. that because insurance won't pay for treatment of infertility, "I'm going to write as if you have had some problems with your period, you've had some frequent urination, things like that so that we can justify it doing them without you spending lots and lots of money."  JA4419.  L.G. recorded a phone call with Perwaiz where he told her she had "big tumors" that needed to be removed.  JA5700.  But Ciccone, who performed L.G.'s ultrasound, testified that there were no such

47

tumors.  JA1509.  And for patient Y.S., Perwaiz—whom employees observed

rewriting patient encounter notes and shredding the original notes, JA355–356,

JA899–900—accidentally left two different sets of symptoms in her medical file

for the same date.  JA5438–5439.

Representatives from two insurance companies, Anthem and Optima,

conducted a review of Perwaiz's overall billings and found that he was a

substantial outlier compared to his peers, performing surgeries on a staggering

38% to 41% of his patients, compared to other OB/GYNs in the same geographic

area during the same time who only performed surgeries on approximately 8% of

patients.  JA1184–1186, JA1855–1856.

Faked diagnostic procedures

The jury convicted on two counts for unnecessary diagnostic procedures, for

patient A.M.B.  Perwaiz billed her hysteroscopy when evidence revealed the

hysteroscope was broken.  JA832–841, JA1847, JA2411–2419.  And, Dr. Goldberg

testified the procedure would be completely ineffective without the use of

materials to distend the uterus, JA563–566, but Perwaiz never used such materials

for his hysteroscopies.  JA358–359, JA1135, JA2218–2219, JA2416–2417.

Insurance statistical data also revealed Perwaiz was a substantial outlier in

hysteroscopies among his peers.  JA1607, JA1373–1374.

Falsified sterilization consent forms

48

- A Medicaid representative testified to rules requiring a 30-day waiting period for sterilizations, and that Medicaid would not reimburse without a required consent form documenting that waiting period. JA1362–1364, JA1436–1437.

- Perwaiz's employees testified to his consistent directive that patients should sign, but not date the required forms, and that Perwaiz himself would add in the date. JA338, JA884–885, JA1064, JA1454.

- Employee Jessica Velasquez reviewed certain sterilization forms and testified that Perwaiz backdated the date of consent—some to before the woman was even a patient—and performed surgeries within the thirty-day waiting period. JA1454–1456.

- Perwaiz admitted to regularly backdating these forms during his direct examination. JA2710–2711.

Third, a targeted analysis of each exhibit's potential impact on the various counts of conviction demonstrates its paltry sway compared to all of the other evidence. The contested information in Exhibit 150, which pertained to hysterectomies contrary to "sound medical judgment," only bore any potential similarity to the second of the four sub-schemes. Nothing in Exhibit 150 referenced any sterilizations performed without proper consent, early inductions, or faked diagnostic procedures. Even focusing on hysterectomies, the low level of detail in Exhibit 150 paled in comparison to the vivid testimony of patients at trial about their own procedures, resulting bodily injuries, Perwaiz falsely telling them they had cancer, and Dr. Goldberg's in-depth review of their medical records.

As to Exhibit 152A, although the indictment discusses defendant falsifying

tax returns, in some instances about his medical equipment, nothing in that

document pertains to any of the sub-schemes.  To the extent it casts doubt on his

credibility generally, the jury heard voluminous other evidence on that front,

including evidence that Perwaiz backdated sterilization forms and obstetric records

and his own lies to patients on recordings.  While Perwaiz contends the exhibit

showed Perwaiz enjoyed a lavish lifestyle, there was overwhelming evidence in

this regard, included the testimony of forensic accountant Daniel Booth before the

district court's ruling.  Even his counsel referenced the same in opening

statements.  JA293.

## II.    There was no plain error in allowing the testimony of six patients not listed in specific counts.

Next, Perwaiz challenges the testimony of the patient-witnesses who were

not named in specific counts of the indictment, contending the admission of such

testimony violated Rule 404(b).  This group comprised six[15] of the twenty-six

patients who testified at the trial.  All six were explicitly identified in the

indictment as examples of Perwaiz's scheme to defraud.  JA59, JA63–65, JA73.

Two of these six patients, D.B.D. and A.D., involved falsified sterilization consent

---

[15] While defendant lists seven patients who were not the subject of charged counts, Def. Br. 28, one of these, A.P.C., *was* named in Count 29.  *See* JA74, JA81 (omitting middle initial), JA3425.

forms. The remaining four, M.C., T.D.C., D.C., and D.A., pertained to surgeries

and procedures based on falsified patient symptoms.

As Perwaiz concedes, this claim of error is subject to plain error review

because Perwaiz did not object below. *United States v. Keita*, 742 F.3d 184, 189

(4th Cir. 2014). Under review for plain error, "authority to remedy an error is

strictly circumscribed." *United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir.

2013). "To establish plain error, a defendant has the burden of showing: (1) that an

error was made; (2) that the error was plain; and (3) that the error affected his

substantial rights." *Id.* at 510. And even where a defendant establishes each of

these three elements, this Court retains discretion whether to correct the plain error.

*Id.*

> **A.    There is no plain error under this Court's precedent.**
>
> **1.    The testimony of the six patients was intrinsic evidence of the charged scheme to defraud, proof of a necessary element of the health care fraud counts.**

Perwaiz was charged with 26 counts of health care fraud from January 2010

through November 2019. JA59. All six patients fit squarely within the charged

scheme, both temporally and substantively. Temporally, the relevant medical

procedures for these patients occurred between 2010 and 2014, the first four years

of the charged scheme.[16]   Substantively, two of these patients were examples of

Perwaiz's sterilization of patients without the 30-day waiting period required by

Medicaid.  JA73.  And the other four were examples of Perwaiz's falsification of

patient symptoms to justify invasive surgeries.  JA63–65.

At the conclusion of the trial, the Court instructed the jury about the alleged

scheme to defraud, including both falsified patient symptoms and falsified

sterilization consent forms, JA3287–3288, and that the existence of the scheme to

defraud was a necessary element of the health care fraud counts, JA3291.  Under

this Court's precedent, the testimony of these six patients was admissible as proof

of the scheme to defraud, regardless of whether their procedures were charged as

specific executions of the scheme.[17]  In *United States v. Bajoghli*, 785 F.3d 957

(4th Cir. 2015), the government charged a health care fraud scheme where a

dermatologist falsely diagnosed patients with cancer and then performed medically

unnecessary surgeries.  The Court held it was an abuse of discretion to "limi[t] the

government's proof to that which is directly relevant to one or more of the 53

executions charged in the indictment, without taking into account the relevance of

uncharged conduct to the alleged overarching scheme."  785 F.3d at 964.

---

[16] *See* JA493 (D.B.D. 2010); JA1287 (A.D. 2011); JA2045–2046, JA2254, (M.C. 2012); JA1022 (D.A. 2012); JA1912 (D.C. 2013); JA1800 (T.D.C. 2014).

[17] The government argued the same in its trial brief.  JA98–99.

Contrary to Perwaiz's contention, evidence of conduct that is uncharged but nonetheless consistent with the scheme to defraud is intrinsic and does not fall under Rule 404(b), as *Bajoghli* recognized.  This is because "evidence of transactions and conduct not charged is relevant to proving the existence of and the boundaries of the conspiracy or scheme."  *Id.* at 963.  Indeed, *Bajoghli* rejected Perwaiz's precise argument, holding that "because evidence of conduct not charged in a specific execution may be relevant to the nature and scope of a scheme charged under § 1347, such evidence is intrinsic to the 'scheme' element, and Rule 404(b) therefore does not … regulate it as 'other bad acts' evidence."  *Id.* at 964.   Therefore, there was no Rule 404(b) error.

### 2. Even if the testimony was not intrinsic evidence, Perwaiz cannot show any Rule 404(b) violation.

Even if the testimony of the six patients is not intrinsic evidence, its admission did not violate Rule 404(b).  Perwaiz makes only very brief argument on this point, contending the testimony would not satisfy Rule 404(b) because his "defense was not that he accidentally did the acts charged in the superseding indictment."  Def. Br. 31.  But one of the core defenses he raised at trial was that he lacked the requisite intent to defraud.  JA296.  Intent is a permissible non-character purpose, Fed. R. Evid. 404(b), and D.A., M.C., D.C., and T.D.C. showed his intent to defraud through unnecessary surgeries and in T.D.C.'s case, lying to insurance about the true purpose of her surgery, knowing insurance would not

53

cover the removal of birth control. JA2267. The similarity of all six patients to the other patients' testimony about unnecessary surgeries and rushed sterilizations enhances its relevance. *Queen*, 132 F.3d at 997. Additionally, Perwaiz put the number of patients who testified directly at issue. JA285, JA2475, JA2552–2553. *See McLaurin*, 764 F.3d at 384.

### 3. Perwaiz cannot show any error that was plain.

An error is plain "if the settled law of the Supreme Court or this circuit establishes that an error has occurred." *United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002). Perwaiz cannot meet this standard because, as just discussed, his claim of error is clearly foreclosed by *Bajoghli*, which remains good law and has never been overruled.

Without citing *Bajoghli*, Perwaiz relies nearly exclusively on this Court's decision in *United States v. Brizuela*, 962 F.3d 784 (4th Cir. 2020). *Brizuela* is in inapposite to Perwaiz's claim of error in this case because it involved a materially different statutory scheme. The doctor in *Brizuela* was not charged with health care fraud, but instead with distribution of controlled substances. 962 F.3d at 786. This difference is critical to Perwaiz's claim of error, because proof of an overarching scheme to defraud is not an element of a charge of drug distribution.

As relevant here, the defendant in *Brizuela* was charged with twenty-one 21 U.S.C. § 841 distribution counts, "each related to specific prescriptions written for

five … patients." 962 F.3d at 789. Two of those patients testified, but the government also called "four other patients … whose prescriptions were not the basis for any of the charges in the indictment." *Id.* at 791. *Brizuela* held that the district court erred in allowing the four additional patients to testify because their testimony "described conduct that was extrinsic to the offenses for which [defendant] was charged." *Id.* at 795.

This holding was tied closely to the specific criminal statute at issue. The Court first held that the patients' testimony did not arise out of the same "series of transactions" as the charged counts because "[a]n unlawful distribution violation under § 841 is … charged by citing a specific prescription." *Id.* at 795–96. Second, the Court held that the testimony of the four additional patients was not "necessary to complete the story of the crime[s] on trial" because such testimony "did not, for example, offer facts that were necessary to prove a specific element of a charged offense." *Id.* at 796. *Brizuela* reasoned that "a doctor's violation of § 841 is prescription specific." *Id.* at 797.

None of this reasoning is applicable in a case where a required element of each of the health care fraud counts is proof of a scheme to defraud. As *Bajoghli* held, patients whose testimony is directly relevant to show the existence of the charged scheme constitute intrinsic evidence outside of Rule 404(b)'s purview. Such evidence is particularly appropriate in a case like this one because the

government must have "adequate latitude to prove its case, especially in a large and complex healthcare-fraud case where the defendant's criminal intent is placed at issue." 785 F.3d at 964.

*Bajoghli*, not *Brizuela*, thus controls this case. *Brizuela* did not purport to—and in any event could not—overrule *Bajoghli*. *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) ("[A] panel of judges *cannot* overrule a decision issued by another panel."). And to the extent *Brizuela* and *Bajoghli* conflict—which they do not—this Court is bound to follow *Bajoghli*, "the earlier of the conflicting opinions." *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004).

To the extent this Court has not addressed this issue directly, where the district court's ruling was consistent with decisions of other circuits, it has not committed plain error. *See United States v. Carthorne*, 878 F.3d 458, 464 (4th Cir. 2017). And other circuits have held that uncharged executions of a scheme to defraud are admissible as intrinsic evidence. For instance, in rejecting an argument in a tax fraud case that the testimony of nine victims of uncharged offenses was impermissible under Rule 404(b), the Eleventh Circuit held that "Rule 404(b) is the wrong place to begin the analysis of this claim." *United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015). "Our Circuit repeatedly has held that evidence of uncharged conduct that is part of the same scheme or series of transactions and uses the same *modus operandi* as the charged offenses is admissible as intrinsic

evidence outside the scope of Rule 404(b)." *Id.  Cf. United States v. Locke*, 643

F.3d 235, 247 (7th Cir. 2011); *United States v. Pless*, 79 F.3d 1217, 1220 (D.C.

Cir. 1996) ("That the government chose to charge as the execution of the scheme

only the three deposits in National [Bank] does not reduce the boundaries of the

scheme, which the statute requires the government to prove."), *cert. denied*, 519

U.S. 900 (1996).

### B.    Perwaiz's substantial rights were not impacted in light of the overwhelming evidence.

"Like harmless error, plain-error review requires the court to assess whether

the error affected the defendant's substantial rights." *United States v. Legins*, 34

F.4th 304, 320 (4th Cir. 2022).  Here, Perwaiz cannot show an impact on his

substantial rights because the evidence against him was overwhelming, *id.* at 322,

as described in the Statement of the Case and harmless error discussion above,

*supra* Part I.C, both of which are incorporated herein.  Notably, he fails to explain

why testimony of D.B.D. and A.D. could possibly have been prejudicial where he

does not contest the testimony of Special Agent Lopes that she identified "[a]bout

three dozen patients … *besides the ones in the indictment*" who had sterilization

procedures "less than 30 days after seeing Dr. Perwaiz for the first time."  JA2422–

JA2423 (emphasis added).  Similarly, while the jury heard from M.C., T.D.C.,

D.C., and D.A. about falsified symptoms and unnecessary surgeries, it also heard

from three times as many patients regarding similar allegations (N.B., Y.S., D.B.,

S.N., L.G., D.P., W.B., M.F., W.H.W., A.G., A.N., and A.F.).

Perwaiz emphasizes the testimony of three of the patients as "particularly sympathetic and dramatic." Def. Br. 32. But he fails to grapple with other vivid testimony, such as patients who suffered pain and complications as a result of Perwaiz's unnecessary surgeries, including: 1) N.B., who still had persistent difficulties going to the bathroom, JA447, 2) S.N., who had trouble passing urine and testified it still "feels like a knife," JA1314, and 3) D.P., who had so much pain for three months after her surgery that she couldn't stand upright, JA1340. Other "sympathetic and dramatic" testimony included numerous patients who testified Perwaiz tricked them into irreversible procedures by falsely telling them they had or would get cancer, and testimony that defendant repeatedly put babies at risk for nothing but his own convenience—even doing this twice to a patient, A.B., who was herself a minor. A pediatric neonatologist testified seeing babies having to go to intensive care due to his early deliveries, which was known as the "Perwaiz special." JA2381.

Further, of the six contested patient-witnesses, four were evidence of the unnecessary surgeries sub-scheme, and two of the falsified sterilization consent forms. Perwaiz fails to explain how those witnesses would have any impact on other sub-schemes, namely falsified due dates and faked diagnostic procedures, or Counts 58 and 59, charging Perwaiz with failing to disclose his background to

58

insurance companies.

As to whether the Court should exercise its discretion to correct the error, Perwaiz only briefly reiterates his argument that their testimony was prejudicial and influenced the verdict.  Def. Br. 32.  For the reasons just discussed, however, he cannot make this showing.

### III.    Perwaiz has not shown any ineffective assistance of counsel at sentencing that is clear in the record and satisfies *Cronic*.

An ineffective assistance of counsel claim is cognizable on direct appeal only "where it conclusively appears in the trial record itself that the defendant was not provided on trial with effective representation."  *United States v. Mandello*, 426 F.2d 1021, 1023 (4th Cir. 1970).  Otherwise, such claims should normally be raised by a motion under 28 U.S.C. § 2255.  *Id.*; *see also Massaro v. United States*, 538 U.S. 500, 504 (2003).

In *Strickland v. Washington*, the Supreme Court enunciated its two-part analysis for evaluating such claims.  466 U.S. 668 (1984).  First, a defendant must show "that counsel's performance was deficient," falling below "an objective standard of reasonableness" measured by "reasonableness under prevailing professional norms." *Id.* at 687–88.  Second, they must show "that the deficient performance prejudiced the defense." *Id.* at 687, 694.  However, the Supreme Court also held in *United States v. Cronic* that the prejudice prong could be presumed under exceptional circumstances that are "so likely to prejudice the

accused that the cost of litigating their effect in a particular case is unjustified."

466 U.S. 648, 658 (1984).  The Court identified three such circumstances,

including when there is a "complete denial of counsel" at a critical stage of the trial

or if counsel "entirely fails to subject the prosecution's case to meaningful

adversarial testing."  *Id.* at 659–60.  The Supreme Court acknowledged the rarity of

such circumstances, warning that "there is generally no basis for finding a Sixth

Amendment violation unless the accused can show how specific errors of counsel

undermined the reliability of the finding of guilt."  *Id.* at 659 n. 26.

Here, Perwaiz relies exclusively on *Cronic* and has not attempted to make

any showing of prejudice.  *See James v. Harrison*, 389 F.3d 450, 455–56 (4th Cir.

2004) (evaluating claim under *Cronic* and not *Strickland* where defendant

expressly relied on the same).  A finding of presumed prejudice under *Cronic* is

"an extremely high showing for a criminal defendant to make." *United States v.*

*Ragin*, 820 F.3d 609, 618 (4th Cir. 2016).

Perwaiz has failed to show he is entitled to relief.  He principally places his

claim in the first of *Cronic*'s categories, arguing that counsel's performance during

sentencing amounted to a "complete denial of counsel at a critical stage of the

trial."  Def. Br. 36–37.  But *Cronic* is not satisfied where counsel only fails to test

the case at *specific* points, even during critical stages.  *Bell v. Cone*, 535 U.S. 685,

696–698 (2002).  And Perwaiz's argument that counsel "did nothing" during

sentencing is contrary to the record.  Def. Br. at 37.  This summary ignores that counsel was responsive to the government's arguments and set forth many facts relevant to sentencing under 18 U.S.C. § 3553: Perwaiz was elderly, ill, lacked a significant criminal history, had no medical license, had not attempted to practice medicine since he was taken into custody, and had a history that suggested that he would comply with any probation terms. JA3568–70.

At sentencing, counsel noted their readiness to answer questions regarding their position paper, responded to the government's request that the court make a finding under the Due Process Protections Act, noted their reasons for not objecting to the admission of two jail calls, and explained defendant was respectful of the court even though he would not allocute.  JA3535–3540.  Counsel's argument at sentencing further highlighted their understanding of both the law and Perwaiz's case.  Counsel first acknowledged that they had "every confidence that the Court will fashion a sentence … that is sufficient but not greater than necessary pursuant to 18 U.S.C. 3553."  JA3569.  After the government compared Perwaiz to Farid Fata and Bernie Madoff, relevant to § 3553's charge to "avoid unwarranted sentence disparities," counsel argued that such a comparison was inappropriate because it was "difficult … to make an argument about where Dr. Perwaiz's sentence should fall among two unrelated cases with very different facts and very different testimony." 18 U.S.C. § 3553(a)(6), JA3569.

Counsel also reminded the court that Perwaiz "is 71 years old. He does have ongoing medical conditions." JA3569. In reference to his previous tax conviction, counsel noted that he "complete[d] [his] probationary period. He did pay back the funds to the United States. He made no effort to flee or to avoid that process. He faced that obligation and satisfied it." JA3570. Responding to the government's argument that Perwaiz's release would result in harm, counsel reminded the district court that Perwaiz "has no license to practice medicine. He has not practiced medicine or attempted to do so since he was taken into custody." JA3570. After pointing out that "there is no expectation if Dr. Perwaiz were released from custody at any point that he would resume the practice of medicine," counsel argued that "there is no reason, based on his history, to believe that he wouldn't follow the terms of probation as he did in the tax case." JA3570. These arguments contravene Perwaiz's argument that counsel provided him with "no sentencing advocacy." Def. Br. 2.

Not only has Perwaiz failed to show his is warranted a presumption of prejudice under *Cronic*, but he has also failed to establish deficiency. The Supreme Court has established that judicial scrutiny of counsel's performance must be "highly deferential." *Strickland*, 466 U.S. at 689. Counsel must be "strongly presumed to have … made all significant decisions in the exercise of reasonable professional judgment." *Id.* Because there are "countless ways to

62

provide effective assistance in any given case," Perwaiz must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*  This Court's precedent reflects the same deference. *Valentino v. Clarke*, 972 F.3d 560 (4th Cir. 2020). The Court must "affirmatively entertain the range of possible reasons that [defendant's] counsel may have had for proceeding as they did." *Id.* at 581.  Perwaiz may overcome the presumption of effective counsel only by showing that "no fair-minded jurist could find one of those [potential] reasons to be sound trial strategy." *Id.*

This deference is so strong that even counsel's silence during the entirety or critical portions of a trial may found to be a strategic decision. *See, e.g.*, *Warner v. Ford*, 752 F.2d 622, 625 (11th Cir. 1985); *Siverson v. O'Leary*, 764 F.2d 1208, 1216 (7th Cir. 1985); *United States v. Sanchez*, 790 F.2d 245, 253 (2nd Cir. 1986); *Fink v. Lockhart*, 823 F.2d 204, 206 (8th Cir. 1987); *Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir. 2002).  As particularly relevant here—where the government requested a below-guideline sentence—this Court has noted in evaluating counsel's decision to remain silent and allow the prosecution to advocate for a below-guideline sentence that "there will be times when the tenor of a court's colloquy might well persuade counsel that silence is his best option." *United States v. Gooding*, 594 F. App'x 123, 129–31 (4th Cir. 2014).

63

Thus, even without explicitly requesting a particular sentence, counsel made an appropriate argument concerning the § 3553 factors, particularly given that the government already requested a sentence of fifty years, well below the advisory guideline range of 475 years. JA3558, JA3577. And the facts brought out by counsel at sentencing plainly speak to the § 3553 factors, including that the sentence ought to "protect the public from further crimes of the defendant" and "provide the defendant with … medical care … in the most effective manner." 18 U.S.C. § 3553(a)(2)(C)-(D). They were also particularly responsive to the Government's argument that "if the defendant was allowed to go out that door today, he has shown that he would go right ahead and continue those crimes." JA3564. Although Perwaiz nevertheless characterizes this argument as a "surrender," Def. Br. 43, he does not overcome the presumption of effective counsel when "the record shows several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy … rather than to attempt to introduce mitigating evidence." *Darden v. Wainwright*, 477 U.S. 168, 185 (1986).

Ultimately, given the record, Perwaiz's counsel was effective under *Cronic* and *Strickland*. Because Perwaiz fails to show that counsel's performance was "outside of the wide range of professionally competent assistance," he has not overcome the deference given to counsel's strategic decisions and cannot meet the

64

extremely high bar for showing deficient counsel performance. *Strickland*, 466 U.S. at 690.

Perwaiz's claim is also not appropriate for review on direct appeal because it does not conclusively appear from the trial record itself that counsel's performance was deficient. Here, while Perwaiz argues that counsel's performance in sentencing "*appears* to be based on a fundamental misunderstanding" that defendants who maintain their innocence during sentencing may not argue for reduced sentences, this motivation is not obvious from the record, as evinced by Perwaiz's own use of the word "appears." Def. Br. 37 (emphasis added). Counsel's choice not to request a particular sentence due to the fact that the Perwaiz "maintains his innocence" could be reasonably perceived as an indication of strategic choice rather than an "unequivocally wrong" misstatement of law from the same counsel who "vigorously contested government evidence" over nearly four weeks of trial, maintained all objections made at trial and in post-trial motions, and made arguments regarding factors relevant to the court's sentencing calculation during sentencing. Def. Br. 34, JA3447–3448.

Even if counsel operated under a misconception of law, relief is not automatic because "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). Perwaiz argues that he was "abandoned" during sentencing

because his counsel did not make a sufficiently robust argument regarding his sentence and did not request a particular sentence despite having "avenues for argument." Def. Br. 34, 42. However, the presumption that counsel acted for tactical reasons is strongest "where a petitioner bases his ineffective-assistance claim on the trial record, creating a situation in which a court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a strong strategic motive." *Yarborough*, 540 U.S. at 5–6 (2003).

Even if this Court finds cognizable ineffective assistance, only his sentence should be vacated, as he concedes. Def. Br. 44. *See United States v. Freeman*, 24 F.4th 320, 332 (4th Cir. 2022).

## Conclusion

For the reasons stated above, there was no error in Perwaiz's convictions or sentence, and the Court should affirm the judgment.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____/s/_____
Elizabeth M. Yusi
E. Rebecca Gantt
Joseph Attias
Assistant United States Attorneys

66

**Statement Regarding Oral Argument**

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word.

I further certify that this brief does not exceed 15,000 words (and is specifically 14,999 words), which the United States has requested in its pending unopposed Motion to Exceed Length Limitations, Dkt. No. 78, as counted by Microsoft Word, excluding the parts of the document excluded by Fed. R. App. P. 32(f) (cover page, table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and signature blocks).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

 

 

/s/
_____

E. Rebecca Gantt
Assistant United States Attorney

**Certificate of Service**

I certify that on July 27, 2023, I filed electronically the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record.

By: _____/s/_____

E. Rebecca Gantt
Assistant United States Attorney
Eastern District of Virginia
101 West Main St., Suite 8000
Norfolk, Virginia 23510
(757) 441-3554
rebecca.gantt@usdoj.gov